IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 84-333

STATE OF MONTANA, ex rel., MIKE GREELY,
Attorney General, WATER COURT OF THE
STATE OF MONTANA and THE JUDGES OF THAT
COURT,

Petitioners,

v.

THE CONFEDERATED SALISH AND KOOTENAI
TRIBES OF THE FLATHEAD RESERVATION,
THE CROW TRIBE OF INDIANS OF THE CROW
RESERVATION, THE NORTHERN CHEYENNE TRIBE
OF THE NORTHERN CHEYENNE RESERVATION,
and THE NORTHERN CHEYENNE RESERVATION,
and THE UNITED STATES OF AMERICA,
Individually and as Trustee for the
Blackfeet Indian Nation of the Blackfeet
Reservation, the Chippewa-Cree Tribes of
the Rocky Boy's Reservation, the Confeder-
ated Salish and Kootenai Tribes of the
Flathead Reservation, The Crow Tribe of
the Crow Reservation, the Gros Ventre,
Sioux and Assiniboine Tribes of the Fort
Belknap and Fort Peck Reservations, the
Northern Cheyenne Tribe of the Northern
Cheyenne Indian Reservation, and the Turtle
Mountain Chippewa Tribe, a North Dakota
Tribe with allotments to land in the State
of Montana,

Respondents.

FILED

JAN 23 1986

*Ethel M. Harrison*
CLERK OF SUPREME COURT
STATE OF MONTANA

ORDER

Having reviewed its opinion in the above-captioned case
and having found certain clerical errors,

IT IS ORDERED that the opinion shall be amended as
follows:

(1) Page 10, paragraph 2, following the quotation
reads:

> San Carlos Apache, 463 U.S. at 564.
> The Court did not, however, rule upon
> whether the Amendment has removed state
> limitations, such as Montana's
> constitutional disclaimer.

1

This paragraph shall be amended so that the last sentence immediately follows the citation to San Carlos Apache, as follows:

> San Carlos Apache, 463 U.S. at 564. The Court did not, however, rule upon whether the Amendment has removed state limitations, such as Montana's constitutional disclaimer.

(2) Page 13, line 6 reads:

> people." in Art. I, Mont. Const. 1972.

The period following "people" shall be deleted so that this line reads:

> people" in Art. I, Mont. Const. 1972.

(3) Page 13, line 11 reads:

> We hold that Art. I, Mont. Const. 1972 does not prohibit

A comma shall be interested after "1972" so that this line reads:

> We hold that Art. I, Mont. Const. 1972, does not prohibit

(4) Page 13, fourth full paragraph, second to last sentence reads:

> Indian reserved water rights are created or recognized by federal treaties, statutes or executive order, and are governed by federal law.

This sentence shall be amended to read:

> Indian reserved water rights are created or recognized by federal treaty, federal statute or executive order, and are governed by federal law.

(5) Page 14, first full paragraph, third sentence reads:

> The United States Supreme Court held that the 1888 agreement which resulted in creation of the Fort Belknap Indian Reservation implied a reservation of water along with the expressed right to exclusive possession of the land.

Commas shall be inserted following "agreement" and "Reservation" so that this sentence reads:

> The United States Supreme Court held that the 1888 agreement, which resulted in creation of the Fort Belknap Indian Reservation, implied a reservation of water along with the expressed right to exclusive possession of the land.

2

(6)  Page 14, first full paragraph, quotation from Winters reads:

> The Indians had command of the lands and the water-command of all their beneficial use, whether kept for hunting, "and grazing roving herds of stock," or turned to agriculture and the arts of civilization.

The hyphen shall be changed to a dash so that the quotation reads:

> The Indians had command of the lands and the water -- command of all their beneficial use, whether kept for hunting, "and grazing roving herds of stock," or turned to agriculture and the arts of civilization.

(7)  Page 16, first full paragraph, line 4 reads:

> 85-2-231(1)(c), 85-2-234(4) & (6) and 85-2-701 through -705,

A comma shall be inserted following (6), so that this line reads:

> 85-2-231(1)(c), 85-2-234(4) & (6), and 85-2-701 through -705,

(8)  Page 16, last sentence reads:

> It is sufficiently broad to allow adjudication of water reserved to protect tribal hunting and fishing rights, including from the depletion of streams below a protected protection level.

This sentence shall be amended to read:

> It is sufficiently broad to allow adjudication of water reserved to protect tribal hunting and fishing rights, including protection from the depletion of streams below a protected level.

(9)  Page 17, second full paragraph, last citation is to R. Collins, Indian Allotment Water Rights, 20 Land and Water Law Review 421, 426 fn. 20 (1985). The explanatory information in the parenthesis reads:

> (decree of water with "immemorial date of priority" to Gila River Tribes, whose members have been irrigators before European contact; decree of water with reservation priority to Apaches, who had not previously irrigated.)

This parenthetical note shall be amended to read:

> (decree of water with "immemorial date of priority" to Gila River Tribes, whose members had been irrigators before European contact; decree of water with reservation priority to Apaches, who had not previously irrigated).

3

(10) Page 19, line 9 reads:

> The Supreme Court held that, under the

This line shall be amended to read:

> The Supreme Court has also held that under the

(11) Page 20, second full paragraph, third sentence reads:

> It may be argued that these statutes might allow an improper limitation on Indian reserved rights result in abandonment for nonuse.

An "or" shall be inserted after "rights" so that this sentence reads:

> It may be argued that these statutes might allow an improper limitation on Indian reserved rights or result in abandonment for nonuse.

(12) Page 23, last paragraph, second sentence reads:

> Although federal water rights can be reserved by implication, like Indian reserved rights under Winters, they are not based upon treaties.

The first comma shall be deleted to that this sentence reads:

> Although federal water rights can be reserved by implication like Indian reserved rights under Winters, they are not based upon treaties.

DATED this 23rd day of January, 1986.

_____
Chief Justice

_____

_____

_____

_____ John C. Shelby

_____

_____
Justices

4

No. 84-333

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

STATE OF MONTANA, ex rel., MIKE GREELY,
Attorney General, WATER COURT OF THE
STATE OF MONTANA and THE JUDGES OF THAT
COURT.,

                                    Petitioners,

        -vs-

THE CONFEDERATED SALISH AND KOOTENAI
TRIBES OF THE FLATHEAD RESERVATION,
THE CROW TRIBE OF INDIANS OF THE CROW
RESERVATION, THE NORTHERN CHEYENNE TRIBE
OF THE NORTHERN CHEYENNE RESERVATION,
and THE UNITED STATES OF AMERICA,
Individually and as Trustee for the
Blackfeet Indian Nation of the Blackfeet
Reservation, the Chippewa-Cree Tribes of
the Rocky Boy's Reservation, the Confeder-
ated Salish and Kootenai Tribes of the
Flathead Reservation, The Crow Tribe of
the Crow Reservation, the Gros Ventre,
Sioux and Assiniboine Tribes of the Fort
Belknap and Fort Peck Reservations, the
Northern Cheyenne Tribe of the Northern
Cheyenne Indian Reservation, and the Turtle
Mountain Chippewa Tribe, a North Dakota
Tribe with allotments to land in the State
of Montana,

                                    Respondents.

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

        For Petitioners:

                Hon. Mike Greely, Attorney General, Helena, Montana
                Clay R. Smith argued, Asst. Atty. General, Helena
                Hon. W. W. Lessley argued, Chief Water Judge, Bozeman,
                Montana ; Sarah Arnott argued, Water Master, Bozeman

        For Respondents:

                Goetz, Madden & Dunn; James H. Goetz argued for
                Confederated Salish and Kootenai Tribes, Bozeman,
                Montana :  also, Daniel F. Decker argued, Pablo,
                Montana
                Byron H. Dunbar, US Attorney, Billings, Montana
                William P. Horn, Under Secretary US Dept. of the
                Interior, Washington, DC
                Patrick Barry, Division of Indian Lands and Natural
                Resources, US Dept. of Justice, Washington, DC
                Allen E. Rowland, President, Northern Cheyenne Tribal
                Council, Lame Deer, Montana
                Norman Hollow, Chairman, Fort Peck Tribal Executive
                Board, Poplar, Montana

(continued, next page)

(Respondents, continued)

Robert S. Pelcyger, Boulder, Colorado
Donald Stewart, Sr., Admin. Chariman, Crow Tribal
Council, Crow Agency, Montana
Thomas E. Luebben, Albuquergue, New Mexico
Joseph R. Membrino, Jr., Asst. Solicitor, Div. Indian
Affairs, US Dept. of Interior, Washington, DC
Blake A. Watson argued, Land & Natural Resources Div.,
Washington, DC
Reid Peyton Chambers; Sonosky, Chambers & Sachse,
Washington, DC
Francis X. Lamebull, Harlem, Montana
Franklin R. Perez, President, Fort Belknap Comm.
Council, Harlem, Montana
John Windy Boy, Chairman, Chippewa Cree Tribe, Box
Elder, Montana
Richard LaFromboise, Chairman, Turtle Mountain
Chippewa Tribe, Belcourt, North Dakota
Joseph Felsman, Chairman, Confederated Salish &
Kootenai Tribes, Pablo, Montana
Earl Old Person, Chairman, Blackfeet Tribe, Browning,
Montana
Joseph J. McKay, Browning, Montana
Calvin Wilson, Busby, Montana
Philip E. Roy, Browning, Montana

For Amicus Curiae:

Jeanne S. Whiteing argued for Native American Rights
Fund, Boulder, Colorado
Steve Bunch argued, Montana Legal Services, Helena,
Montana
Nancy Richardson, Montana Legal Services, Browning,
Montana
D. Michael Eakin, Montana Legal Services, Billings,
Montana

---

Submitted:  April 11, 1985

Decided:  December 18, 1985

Filed:  DEC 1 8 1985

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

On July 13, 1979, this Court ordered the statewide adjudication of all water rights in Montana to be commenced pursuant to § 85-2-212, MCA. On August 3, 1984, the State of Montana, ex rel. Mike Greely, Attorney General, filed an application for writ of supervisory control of the Montana Water Court and the judges of that court. The State asked this Court to assume original jurisdiction to determine two issues: (1) Is Montana's Water Use Act adequate to adjudicate federal and Indian reserved water rights? (2) Does Article I of the Montana Constitution prohibit the Water Court from asserting jurisdiction over reserved water rights held in trust by the United States for Indians and Indian tribes within the State of Montana? Both of these issues were raised in the federal courts but left unresolved in San Carlos Apache Tribe v. Arizona and Montana v. Northern Cheyenne Tribe (1983), 463 U.S. 545, 570 fn. 20, reh. denied 104 S.Ct. 209-10; Northern Cheyenne Tribe v. Adsit (9th Cir. 1983), 721 F.2d 1187, 1188.

The Attorney General requested permission to make an ex parte presentation in support of the State's application for the extraordinary writ. We granted this request. However, prior to the State's presentation, the Confederated Salish and Kootenai Tribes petitioned for permission to participate as amicus curiae. This Court scheduled limited oral argument on the question of whether it should assume original jurisdiction over the State's application. The Water Court joined the State in requesting permission to proceed to adjudicate Indian and federal reserved water rights.

Following argument before this Court en banc, we assumed original jurisdiction to exercise supervisory control over the Water Court and to determine three questions of first

impression regarding water rights in Montana. Supreme Court Order No. 84-333, dated January 23, 1985; State ex rel. Greely v. Water Court of State (1984), 691 P.2d 833, 835, 41 St.Rep. 2373, 2375. For purposes of oral argument on the substantive issues, this Court designated the State and the Water Court as co-petitioners. Both requested permission for the Water Court to proceed to adjudicate reserved water rights. The United States of America, all of the Indian tribes in Montana, and a North Dakota tribe with allotments to land in Montana were designated as respondents. State ex rel. Greely, 691 P.2d at 840, 41 St.Rep. at 2382.

The Montana tribes petitioned to withdraw as named parties and to appear as amici curiae. These petitions were granted. The Turtle Mountain Chippewa Tribe of North Dakota never responded to these proceedings. On its own motion, the Court dismissed the Turtle Mountain Chippewa Tribe as a named respondent. The Confederated Salish and Kootenai, the Crow and the Northern Cheyenne Tribes later filed motions to be reinstated as parties to this proceeding. Their motions were granted pursuant to San Carlos Apache, 463 U.S. at 566 fn. 17. These four Montana Indian tribes remain as individually named respondents. The United States of America, appears individually and as trustee for all the tribes with land in Montana. State ex rel. Greely, 691 P.2d at 840, 41 St.Rep. at 2382.

The issues for determination are:

1. Is the Water Court of Montana prohibited from exercising jurisdiction over Indian reserved water rights based on Article I of the 1972 Montana Constitution?

2. Is the Montana Water Use Act, Title 85, Chap. 2, MCA, adequate to adjudicate Indian reserved water rights?

4

3. Is the Water Use Act, Title 85, Chap. 2, MCA, adequate to adjudicate federal reserved water rights?

We hold that Art. I, Mont. Const. 1972 does not bar state jurisdiction to adjudicate Indian reserved water rights in Montana. We hold the Montana Water Use Act adequate on its face to adjudicate Indian and federal reserved water rights.

I

Is the Water Court prohibited from exercising jurisdiction over Indian reserved water rights based on Art. I, Mont. Const. 1972?

Article I, Mont. Const. 1972, entitled "Compact with the United States," guarantees that:

> All provisions of the enabling act of Congress (approved February 22, 1889, 25 Stat. 676), as amended and of Ordinance No. 1, appended to the Constitution of the state of Montana and approved February 22, 1889, including the agreement and declaration that all lands owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States, continue in full force and effect until revoked by the consent of the United States and the people of Montana.

Several of the tribes argue that consent of the people of Montana has not been given to the State to adjudicate or control water on Indian lands. The tribes assert that a popular vote of the people on a constitutional amendment is required. They argue that the consent of the people to Congress' revocation of absolute federal jurisdiction over Indian water rights cannot be granted by legislative enactment.

Montana was admitted to statehood in 1889. As a prerequisite to admission to the Union, a federal Enabling Act required North Dakota, South Dakota, Montana and Washington to hold constitutional conventions and declare:

5

> That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to . . . all lands . . . owned or held by any Indian or Indian tribes . . . and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States, . . .

The Enabling Act, § 4 Second; 25 Stat. 676 (1889). In response to this requirement, Montana adopted Ordinance No. I, Second (1889), and disclaimed any right or title to Indian lands. This Ordinance was "irrevocable without the consent of the United States and the people of . . . Montana." Ordinance No. I, Sixth (1889).

Similar disclaimer language was incorporated into the constitutions of many of the western states, including Alaska, Arizona, Idaho, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, Washington and Wyoming. See San Carlos Apache, 463 U.S. at 561 fn. 12. Colorado was admitted to the Union in 1876 and was not required to insert a disclaimer in its constitution. The reason Montana was subject to a disclaimer requirement and Colorado was not "has more to do with historical timing than with deliberate congressional selection." San Carolos Apache, 463 U.S. at 562. However, a substantial majority of Indian land, including most of the largest Indian reservations, lies within states with disclaimers in their constitutions. San Carlos Apache, 463 U.S. at 561.

Montana has seven Indian reservations with tribal claims to reserved water rights on the Tongue River and Big Horn River in the Yellowstone Basin, Milk and St. Mary systems, Big Muddy and Poplar River systems, tributaries of the Missouri River, Flathead River system, Marias River system, Flathead Lake with the Flathead River system, and the Kootenai River. Western Network, What Indian Water Means To the West 58-61 (1982). Indian reservations in Montana are

considerable in size and the potential amount of water reserved is tremendous.

In 1952, Congress diminished the scope of absolute federal jurisdiction by allowing state courts concurrent jurisdiction to adjudicate federal water rights. The McCarran Amendment gave consent for the United States to be joined as a defendant in any suit:

> (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit.

43 U.S.C. § 666(a). "By enacting the McCarran Amendment, Congress waived the sovereign immunity of the United States to involuntary joinder as a party in state court general water rights adjudications." United States v. City and County of Denver (Colo. 1983), 656 P.2d 1, 9.

The McCarran Amendment did not expressly waive the sovereign immunity of Indian tribes. Nevertheless, the United States Supreme Court held in 1976 that the McCarran Amendment applied to Indian water rights. Colorado River Water Cons. Dist. v. U.S. (1976), 424 U.S. 800, 809.

The Colorado River decision resolved two questions that had not been previously addressed. First, the Court concluded that the effect of the Amendment was to give concurrent state and federal jurisdiction over controversies involving federal rights to the use of water. Second, the Amendment extended state jurisdiction to Indian reserved rights as well as federal reserved rights. Colorado River, 424 U.S. at 809 "[B]earing in mind the ubiquitous nature of Indian water rights in the Southwest, it is clear that a construction of the Amendment excluding those rights from its

7

coverage would enervate the Amendment's objective." Colorado River, 424 U.S. at 811.

Prior to the 1976 Colorado River decision allowing state courts to adjudicate Indian reserved water rights, Montana adopted a new constitution. Article I of the 1972 Montana Constitution declares that all Indian lands in Montana "shall remain under the absolute jurisdiction and control of the congress of the United States . . . until revoked by the consent of the United States and the people of Montana." The Constitutional Convention incorporated the federal Enabling Act requirements into the new Constitution based upon the requests of various tribes and upon the State's continued commitment to follow federal law with respect to Indian lands. VII Montana Constitutional Convention 2567-68 (1972).

Montana's new constitution also includes an article pertaining to water rights. Article IX, § 3, Mont. Const. 1972 states that:

(1) All existing rights to the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed.

(2) The use of all water that is now or may hereafter be appropriated for sale, rent, distribution, or other beneficial use, the right of way over the lands of others for all ditches, drains, flumes, canals, and aqueducts necessarily used in connection therewith, and the sites for reservoirs necessary for collecting and storing water shall be held to be a public use.

(3) All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law.

(4) The legislature shall provide for the administration, control, and regulation of water rights and shall establish a system of centralized records, in addition to the present system of local records.

On June 6, 1972, the people of Montana ratified the constitution, as submitted to them by the Constitutional

Convention. The new constitution became effective on July 1, 1973. Pursuant to Art. IX, § 3(4), Mont. Const. 1972, the legislature enacted the Water Use Act of 1973. Sec. 2, Ch. 452, L. 1973. The Water Use Act of Montana became effective July 1, 1973.

The Attorney General's petition asks this Court to determine whether Art. I, Mont. Const. 1972, prohibits the Water Court of Montana from adjudicating Indian reserved water rights. The Attorney General asserts that the constitutional disclaimer was intended to have the same scope as the federal Enabling Act. He argues that Art. I restricts state jurisdiction only to the extent required by federal preemption standards, and that state adjudication of Indian reserved water rights is no longer preempted by federal law.

The Water Court encourages this Court to bend to federal Indian policy and to avoid piecemeal adjudication of water rights by allowing the state court to adjudicate Indian reserved rights in Montana.

The tribes argue that the disclaimer cannot be repealed by implication and that express language must be employed to change a constitutional provision. They assert that the most that the McCarran Amendment may have accomplished is to give federal consent to the people of Montana to amend their constitution. They argue that until amended, the disclaimer remains a separate and independent barrier to state jurisdiction over Indian lands and Indian water on the reservations.

The United States of America contends that the McCarran Amendment removed all federal obstacles to state jurisdiction and that the people of Montana manifested their consent by enacting the Water Use Act.

9

Various tribes and the Native American Rights Fund, as amicus curiae, argue that the constitutional disclaimer stems from peace treaties between the United States and the tribes. In these treaties, the Indians agreed to subject themselves to federal law and the United States agreed to assume exclusive jurisdiction and responsibility for the protection of the Indians and their lands. The State of Montana was carved out of a territory where Indian reservations existed prior to Montana's statehood in 1889. The constitutional disclaimers of 1889 and 1972 recognize the federal government's exclusive jurisdiction over Indian lands within the state.

The United States Supreme Court has stated that:

> [W]hatever limitation the Enabling Acts or federal policy may have originally placed on state-court jurisdiction over Indian water rights, those limitations were removed by the McCarran Amendment.

San Carlos Apache, 463 U.S. at 564.

The Court did not, however, rule upon whether the Amendment had removed state limitations, such as Montana's constitutional disclaimer.

> [T]o the extent that a claimed bar to state jurisdiction in these cases is premised on the respective State Constitutions, that is a question of state law over which the state courts have binding authority.

San Carlos Apache, 463 U.S. at 561.

Art. I, Mont. Const. 1972 provides that all Indian lands shall remain under the absolute jurisdiction and control of the Congress until revoked by the consent of the United States and the people of Montana. The term "the people" appears fourteen times in the Preamble and the first three articles of our Constitution. "The framers used the term 'the people' as a shorthand reference to the citizens of the

entire State of Montana." Anaconda-Deer Lodge County v. Lorello (1979), 181 Mont. 195, 197, 592 P.2d 1381, 1382.

In State ex rel. McDonald v. District. Ct. of Fourth J.D. (1972), 159 Mont. 156, 496 P.2d 78, the Confederated Salish and Kootenai Tribes challenged the State's assumption of criminal jurisdiction over the Flathead Indian Reservation without a constitutional amendment of the disclaimer clause. This Court held that the "consent of the people of the state," as used in Ordinance I, Sec. 2 of the Montana Constitution (1889), did not require a constitutional amendment. Congress had authorized states to assume criminal and civil jurisdiction on Indian reservations under Public Law 280, 67 Stat. 588, 590 (1953). Section 7 of Public Law 280 provides in pertinent part:

> The consent of the United States is hereby given to any . . . State not having jurisdiction with respect to criminal offenses * * *, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof.

In 1963, the Montana legislature enacted §§ 83-801 through 83-806, RCM, in substance obligating the State to assert criminal jurisdiction over Indians on the Flathead Indian Reservation. Amendments to the original Public Law 280 required tribal consent. That consent was granted on the Flathead Reservation by enactment of a tribal ordinance. See McDonald, 159 Mont. at 160-61, 496 P.2d at 80-81.

McDonald argued that without a constitutional amendment by popular vote of the people, the state court could not assert jurisdiction under Public Law 280. This Court construed Public Law 280 and Montana's constitutional disclaimer as follows:

> Ordinance I, Sec. 2 of the Montana Constitution simply provides that all Indian lands "shall remain under the absolute jurisdiction and control of the

11

congress of the United States." This requirement was imposed by the United States upon the people of Montana as a precondition of statehood. Over 60 years later the United States Congress, in the exercise of its absolute jurisdiction and control over Indian lands, enacted Public Law 280 granting the state of Montana criminal jurisdiction over offenses committed by Indians on Indian reservations upon amendment of its constitution or statutes, where necessary, to remove any legal impediment. Congress could at any time repeal Public Law 280 and terminate any jurisdiction of the state courts of Montana over crimes committed by Indians on Indian Reservations. Thus Indian lands "remain under the absolute jurisdiction and control of the congress of the United States' within the meaning of Montana Constitution, Ordinance I, Sec. 2. Accordingly, no constitutional amendment is necessary or required.

McDonald, 159 Mont. at 163, 496 P.2d at 81-82. The Court found the reasoning in two Washington cases to be persuasive.

The state of Washington, under like constitutional provisions as Montana's, has held that the "consent of the people" necessary to revoke Washington's constitutional requirement that Indian lands "shall remain under the absolute jurisdiction and control of the congress of the United States" may be accomplished by legislative enactment and does not require a vote of the people on a constitutional amendment. State v. Paul, 53 Wash.2d 789, 337 P.2d 33 (1959); Makah Indian Tribe v. State, 76 Wash.2d 485, 457 P.2d 590 (1969). While we recognize we are not bound by this determination and that "consent of the people" does not necessarily mean the same thing in Washington's constitution as it does in Montana's constitution, the reasoning in Paul and Makah is nonetheless persuasive.

McDonald, 159 Mont. at 163-64, 496 P.2d at 82. The Court held that the legislative enactment of session laws was "a valid and binding consent of the people of Montana to criminal jurisdiction by state courts over Indians committing criminal offenses on the Flathead Indian Reservation pursuant to Public Law 280." McDonald, 159 Mont. at 165, 496 P.2d at 82.

We recognize that Montana's assertion of Public Law 280 jurisdiction on the Flathead Reservation has no bearing on the presence or absence of state jurisdiction over Indian water rights. In fact, Public Law 280 specifically withheld

12

from state courts jurisdiction to adjudicate ownership or right to possession of "any water rights." 25 U.S.C. § 1322(b). However, our interpretation of the phrase "consent of the people," as discussed in McDonald, is applicable to our holding here regarding "consent of the people." in Art. I, Mont. Const. 1972.

We conclude that the legislature's enactment of the Water Use Act constitutes a valid and binding consent of the people of Montana to Congress' grant of state jurisdiction over Indian reserved water rights.

We hold that Art. I, Mont. Const. 1972 does not prohibit the Water Court of Montana from exercising jurisdiction over Indian reserved water rights.

II

Is the Montana Water Use Act adequate to adjudicate Indian reserved water rights?

State appropriative water rights and Indian reserved water rights differ in origin and definition. See State ex rel. Greely, 691 P.2d at 841-42, 41 St.Rep. at 2383-85. State-created water rights are defined and governed by state law. See Art. IX, § 3(4), Mont. Const. 1972; § 85-2-101, MCA. Indian reserved water rights are created or recognized by federal treaties, statutes or executive order, and are governed by federal law. The Water Use Act of Montana was amended in 1985 to better reflect these distinctions.

Most western states, including Montana, adopted the prior appropriation doctrine under which water is apportioned on the basis of use. "As between appropriators, the first in time is the first in right." Section 85-2-401(1), MCA. An appropriator is generally entitled to a specified quantity of water so long as actual, beneficial use is made of the water. See § 85-2-404, MCA. Generally, an appropriator of a

13

state-created right must divert, impound or withdraw water to appropriate. See §§ 85-2-102(1) & 85-2-234(5)(g), MCA.

The doctrine of reserved water rights conflicts with prior appropriation principles in several respects. Indian reserved water rights were first enunciated in Winters v. United States (1908), 207 U.S. 564. The United States Supreme Court held that the 1888 agreement which resulted in creation of the Fort Belknap Indian Reservation implied a reservation of water along with the expressed right to exclusive possession of the land. Winters, 207 U.S. at 575-76. The Court implied a reservation of water to accomplish the purposes of the treaty agreement. Quoting the treaty, the Court held that the amount of water reserved must be sufficient to allow the Indians to become a "pastoral and civilized people."

> The Indians had command of the lands and the waters-command of all their beneficial use, whether kept for hunting, "and grazing roving herds of stock," or turned to agriculture and the arts of civilization.

Winters, 207 U.S. at 576.

Appropriative rights are based on actual use. Appropriation for beneficial use is governed by state law. Reserved water rights are established by reference to the purposes of the reservation rather than to actual, present use of the water. The basis for an Indian reserved water right is the treaty, federal statute or executive order setting aside the reservation. Treaty interpretation and statutory construction are governed by federal Indian law.

The federal courts have developed canons of construction in Indian law that recognize the federal trust responsibility to Indians. Although originally applied to interpretation of treaties, these judicial canons of construction have also been applied in the area of statutory construction. Northern

14

Cheyenne Tribe v. Hollowbreast (1976), 425 U.S. 649, 655 fn. 7; Squire v. Capoeman (1956), 351 U.S. 1, 6-7.

Any ambiguity in a treaty must be resolved in favor of the Indians. Washington v. Fishing Vessel Ass'n (1979), 443 U.S. 658, 675-76; Confederated Salish & Kootenai Tribes, Etc. v. Namen (9th Cir. 1982), 665 F.2d 951, 962, cert. denied 459 U.S. 977 (1982). Treaties must be interpreted as the Indians themselves would have understood them. Fishing Vessel Ass'n, 443 U.S. at 676; Choctaw Nation v. Oklahoma (1970), 397 U.S. 620, 631. Indian treaties must be liberally construed in favor of the Indians. Tulee v. Washington (1942), 315 U.S. 681, 684-85; United States v. Walker River Irr. Dist. (9th Cir. 1939), 104 F.2d 334, 337.

Foremost among these federal Indian law principles is that "the treaty is not a grant of rights to the Indians, but a grant of rights from them -- a reservation of those not granted." United States v. Adair (9th Cir. 1983), 723 F.2d 1394, 1412-13, cert. denied 104 U.S. 3536 (1984), quoting United States v. Winans (1905), 198 U.S. 371, 381. See also, Fishing Vessel Ass'n 443 U.S. at 678 & 680-81; United States v. Wheeler (1978), 435 U.S. 313, 327 n. 24; Klamath Ind. Tribe v. Or. Dept of Fish & Wildlife (9th Cir. 1984), 729 F.2d 609, 611.

Treaties do not implicitly diminish aboriginal holdings. Uninterrupted use and occupation of land can create "aboriginal title." See United States v. Klamath Indians (1938), 304 U.S. 119, 122-23; Adair, 723 F.2d at 1413. Only the United States can extinguish such aboriginal title. United States v. Tillamooks (1946), 329 U.S. 40, 46. An Indian reservation will be defined to protect any pre-existing possessory rights of the Indians unless a contrary intent clearly appears in the document or statute

15

that created the reservation. United States v. Santa Fe Pacfic R. Co. (1941), 314 U.S. 339, 353-54. "[S]tatutes passed for the benefit of the Indians are to be liberally construed and all doubts are to be resolved in their favor." Hollowbreast, 425 U.S. 649, 655 n. 7. When adjudicating Indian reserved water rights, Montana courts must follow these principles of construction developed by the federal judiciary.

Montana's Water Use Act, as amended, permits the Water Court to treat Indian reserved water rights differently from state appropriative rights. See §§ 85-2-224(3), 85-2-231(1)(c), 85-2-234(4) & (6) and 85-2-701 through -705, MCA. The Act recognizes and confirms "existing rights to the use of any waters for any useful or beneficial purpose." Section 85-2-101(4), MCA. "Existing right" means a right to the use of water which would be protected under the law as it existed prior to July 1, 1973. Section 85-2-102(8), MCA.

The definition of "beneficial use" in the Act includes: "use of water for the benefit of the appropriator, other persons, or the public, including but not limited to agricultural (including stock water), domestic, fish and wildlife, industrial, irrigation, mining, municipal, power, and recreational uses." Section 85-2-102(2), MCA. This definition recognizes nonconsumptive and instream uses for fish and wildlife. It is sufficiently broad to allow adjudication of water reserved to protect tribal hunting and fishing rights, including from the depletion of streams below a protected protection level. See Adair, 723 F.2d at 1411, citing Cappaert v. United States (1976), 426 U.S. 128, 143.

16

The Act permits tribes to negotiate with the State and agree upon the extent of the reserved water rights of each tribe. Section 85-2-702, MCA. In order to be binding, a negotiated compact between the State and tribe must be ratified by the Montana legislature and the tribe. Section 85-2-702(3), MCA. The terms of any ratified compact must be included in the Water Court's final decree without alteration, unless the State and the tribe have given prior written consent. Section 85-2-234(2), MCA.

The date of priority of an Indian reserved water right depends upon the nature and purpose of the right. In many instances, the federal government's plan to convert nomadic Indians into farmers involved a new use of water. If the use for which the water was reserved is a use that did not exist prior to creation of the Indian reservation, the priority date is the date the reservation was created. Arizona v. California (1963), 373 U.S. 546, 600 (irrigation held to be a new use with an 1865 priority date). A different rule applies to tribal uses that existed before creation of the reservation. Where the existence of a preexisting tribal use is confirmed by treaty, the courts characterize the priority date as "time immemorial." Adair, 723 F.2d at 1414. See R. Collins, Indian Allotment Water Rights, 20 Land and Water Law Review 421, 426 fn. 20 (1985), discussing United States v. Gila Valley Irrigation Dist., No. 59 Globe Eq., decree at 86 (D. Ariz. June 29, 1935) (decree of water with "immemorial date of priority" to Gila River Tribes, whose members have been irrigators before European contact; decree of water with reservation priority to Apaches, who had not previously irrigated.)

More than one priority date may apply to water rights reserved by the same tribe. The Klamath Indian Tribe's

17

Treaty of 1864 recognized tribal agriculture, hunting, fishing and gathering. The Ninth Circuit Court of Appeals held that irrigation was a "new use" and had a priority date of 1864. The latter purposes were based on tribal uses that existed before creation of the reservation. Water reserved for hunting and fishing purposes had a priority date of "time immemorial." Adair, 723 F.2d at 1412-15.

The Montana Water Use Act does not define priority date. Section 85-2-224(3)(d), MCA, directs the reserved right claimant to include "the priority date claimed" in its statement of claim to the Water Court. The Act permits the Water Court to apply federal law in determining a proper priority date for each Indian reserved water right.

Winters rights are difficult to quantify. Because the purposes of each reservation differ, federal courts have devised several general quantification standards. These standards differ depending upon the purpose for which the water was reserved.

For agricultural purposes, the reserved right is a right to sufficient water to "irrigate all the practicably irrigable acreage on the reservation." Arizona v. California, 373 U.S. at 600. Arizona v. California involved agricultural Indian reservations with Winters rights for irrigation purposes. The Court noted that present and future needs should be quantified with reference to the practicably irrigable acreage on each reservation. Individual Indian allottees have a right to use a portion of water reserved for agricultural purposes. United States v. Powers (1939), 305 U.S. 527, 531. An Indian allottee may use water for present and future irrigation needs based on "the number of irrigable acres he owns." Colville Confederated Tribes v. Walton (9th Cir. 1981), 647 F.2d 42, 51. "[T]he full measure of this

18

right need not be exercised immediately." Adair, 723 F.2d at 1416.

The right to water reserved to preserve tribal hunting and fishing rights is unusual in that it is non-consumptive. A reserved right for hunting and fishing purposes "consists of the right to prevent other appropriators from depleting the stream waters below a protected level in any area where the non-consumptive right applies." Adair, 723 F.2d at 1411.

The Supreme Court held that, under the implied-reservation-of-water-rights doctrine, Indians are entitled to sufficient water "to develop, preserve, produce or sustain food and other resources of the reservation, to make it livable." Arizona v. California, 373 U.S. at 599-600 [decree entered, 376 U.S. 340, (1964)]. "[I]ndian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood -- that is to say, a moderate living." Washington v. Fishing Vessel Ass'n, 443 U.S. at 686.

The Winters Court held that reserved water on the Fort Belknap Reservation could be beneficially used for "acts of civilization" as well as for agricultural purposes. Winters, 207 U.S. at 576. It may be that such "acts of civilization" will include consumptive uses for industrial purposes. We have not found decisive federal cases on the extent of Indian water rights for uses classed as "acts of civilization."

It is clear, however, that Indian reserved water rights may include future uses. Arizona v. California, 373 U.S. at 600-01; United States v. Ahtanum Irrigation District (9th Cir. 1964), 330 F.2d 897, 914. Most reservations have used only a fraction of their reserved water. National Water Commission, Water Policies for the Future 51-61 (1973).

19

However, reserved rights may reflect future need as well as present use. For example, the "practically irrigable acreage" standard applies to future irrigation of reservation land, not present irrigation practices and current consumptive uses.

The Water Use Act, as amended, recognizes that a reserved right may exist without a present use. Section 85-2-224(3), MCA, permits a "statement of claim for rights reserved under the laws of the United States which have not yet been put to use." The Act permits Indian reserved rights to be decreed without a current use. Section 85-2-234(6), MCA, requires the final decree of tribal water rights to state, among other things:

> (e) the purpose for which the water included in the right is currently used, if at all;
>
> (f) the place of use and a description of the land, if any, to which the right is appurtenant;
>
> (g) the place and means of diversion, if any . . .

(Emphasis supplied.)

Section 85-2-402, MCA, includes extensive provisions which are to be applied in the event of a proposed change in use or in appropriation right. In a comparable way, § 85-2-404, MCA, sets forth a standard under which an appropriator may abandon a water right. It may be argued that these statutes might allow an improper limitation on Indian reserved rights result in abandonment for nonuse. We presume that the Water Court will not apply these code sections in an improper manner to the claimants of Indian reserved water rights. Federal Indian law must be applied in these areas as well.

Several tribes have claimed that the involvement of the Department of Natural Resources with the Water Court prior to issuance of preliminary decrees may violate the requirements

of due process. Section 85-2-243, MCA, authorizes the Department to assist the Water Court, including collecting information and conducting field investigations of questionable claims. While we recognize that the Act places no limits on the manner in which the Water Court utilizes the information furnished by the Department, we will not presume any improper application of the Act on the part of the Water Court. Actual violations of procedural due process and other issues regarding the Act as applied are reviewable on appeal after a factual record is established.

In a similar manner, it may be contended that § 85-2-316, MCA, which limits the reservation of future uses to certain river basins, sets forth an improper limitation on Indian reserved rights. We also presume that the Water Court will not apply these statutes without regard to controlling federal law on Indian water rights.

We recognize that the Water Use Act of Montana does not explicitly state that the Water Court shall apply federal law in adjudicating Indian reserved rights. However, we conclude that is not fatal to the adequacy of the Act on its face. We hold that state courts are required to follow federal law with regard to those water rights.

We recognize the fear on the part of various parties that the subjection of Indian water rights to state court jurisdiction will of necessity hurt the Indian people. We quote again from San Carlos Apache:

> Mere subjection of Indian rights to legal challenge in state court . . . would no more imperil those rights than would a suit brought by the Government in district court for their declaration . . . . . The Government has not abdicated any responsibility fully to defend Indian rights in state court, and Indian interests may be satisfactorily protected under regimes of state law. The Amendment in no way abridges any

> substantive claim on behalf of Indians under the doctrine of reserved rights. Moreover, as Eagle County said, "questions [arising from the collision of private rights and reserved rights of the United States], including the volume and scope of particular reserved rights, are federal questions which, if preserved, can be reviewed [by the Supreme Court] after final judgment by the Colorado court." 401 U.S., at 526.

463 U.S. at 551, quoting Colorado River, 424 U.S. at 812-13.

The United States Supreme Court reserves the right to review state court adjudications of Indian reserved water rights. As emphasized in San Carlos Apache:

> [O]ur decision in no way changes the substantive law by which Indians rights in state water adjudications must be judged. State courts, as much as federal courts, have a solemn obligation to follow federal law. Moreover, any state-court decision alleged to abridge Indian water rights protected by federal law can expect to receive, if brought for review before this Court, a particularized and exacting scrutiny commensurate with the powerful federal interest in safeguarding those rights from state encroachment.

463 U.S. at 571.

We conclude that the Montana Water Use Act on its face is adequate to adjudicate Indian reserved water rights. Should the Water Court abridge Indian reserved water rights by improperly applying the Act and the federal law that protects those rights, that failure can be appealed to this Court as well as to the Supreme Court of the United States for "a particularized and exacting scrutiny."

III

Is the Water Use Act of Montana adequate to adjudicate federal reserved water rights?

In order to construe the adequacy of the Act with reference to federal reserved rights, we must consider how

22

federally-created reserved rights differ from state-created appropriative rights. We also consider the distinctions between federal reserved rights and Indian reserved rights.

Federal reserved rights differ from state appropriative rights in origin, determination of priority date, and quantification standards. As noted above, appropriative water rights are state-created and in general originate from actual use of the water. Generally speaking, their priority date is the date the water was first put to use for a beneficial purpose. They are quantified on the basis of present use. They are governed by state law.

"Federal water rights are not dependent upon state law or state procedures . . . " Cappaert, 426 U.S. at 145. Federal reserved rights are created by federal statute, executive order or agreement. Their priority date is the date that the federal lands were withdrawn from the public domain for federal purpose. Quantification is not based upon actual use, but upon "minimal need" to fulfill the purposes of the reservation of federal lands. Cappaert, 426 U.S. at 141.

Federal reserved water rights differ from Indian reserved water rights in origin, ownership, determination of priority date, the manner in which the purpose of the reservation is determined, and quantification standards.

The first distinction is origin. Although federal water rights can be reserved by implication, like Indian reserved rights under Winters, they are not based upon treaties. Federal water rights are based upon statute, executive order or agreement.

> A non-Indian federal reserved water right . . . is
> created when Congress or the President through an
> order or agreement reserves or dedicates public
> lands to a use or program requiring the use of

23

water in order to carry out the purpose for which the reservation is made.

W. Coldiron, <u>Non-Indian Federal Reserved Water Rights</u>, Montana Lawyer 5 (Jan. 1985). Federal reserved water rights are created by the document that reserves the land from the public domain. By contrast, aboriginal-Indian reserved water rights exist from time immemorial and are merely recognized by the document that reserves the Indian land. Federal reserved water rights, on the other hand, are created by and cannot predate the document that reserved the federal land from the public domain.

Form of ownership is another distinction between federal and Indian reserved water rights. The United States is not the owner of Indian reserved rights. It is a trustee for the benefit of the Indians. Its powers regarding Indian water rights are constrained by its fiduciary duty to the tribes and allotees, who are the beneficiaries of the land that the United States holds in trust. Indian reserved water rights are "owned" by the Indians.

The United States owns federal reserved water rights. Although a public trust argument might be made with reference to national parks and wilderness areas, the United States can lease, sell, quitclaim, release, encumber or convey its own federal reserved water rights.

Determination of the priority date of a reserved right is not based upon actual use by Indians or the United States. The priority date of federal reserved water rights is always the date on which the federal land was reserved from the public domain. Unlike Indian reserved rights, there is no need to look to the purpose and nature of the federal reservation in order to determine the priority date of a

24

right reserved by the federal government because there is no such thing as aboriginal use by the government.

The quantification standard for federal reserved water rights is a "minimal need" standard. "The implied-reservation-of-water doctrine . . . reserves only that amount of water necessary to fulfill the primary purpose of the reservation, no more." Cappaert, 426 U.S. at 141-42; United States v. New Mexico (1978), 438 U.S. 696, 700. Unlike Indian reserved rights, which include water for future needs and changes in use, federal reserved rights are quantified on the basis of the original, primary purposes of the reservation. Water for secondary purposes is not factored into the quantification. See Cappaert, 426 U.S. at 141-42.

The Colorado Supreme Court summarized the test of federal reserved rights as follows:

> For each federal claim of a reserved water right, the trier of fact must examine the documents reserving the land from the public domain and the underlying legislation authorizing the reservation; determine the precise federal purposes to be served by such legislation; determine whether water is essential for the primary purposes of the reservation; and finally determine the precise quantity of water - the minimal need as set forth in Cappaert and New Mexico -- required for such purposes.

United States v. City and County of Denver (Colo. 1983), 656 P.2d 1, 20. There are no special canons of construction for interpreting the documents that create federal reserved water rights. The purposes for which the federal government reserves land are strictly construed. See Cappaert, 426 U.S. at 141-42 (preservation of Devil's Hole Monument to the extent necessary to preserve its scientific value, but not necessarily its scenic features); United States v. New Mexico, 438 U.S. at 705 (original national forest purpose not extended to aesthetic, recreational and fish-preservation purposes). The purposes of Indian reserved rights, on the

other hand, are given broader interpretation in order to further the federal goal of Indian self-sufficiency. United States v. Finch (9th Cir. 1976), 548 F.2d 822, 832, reversed on other grounds 433 U.S. 676 (1977); Pyramid Lake Paiute Tribe of Indians v. Morton (D.D.C. 1973), 354 F.Supp. 252 (water reserved in quantities sufficient to sustain implicit purpose of fishing as well as explicit purpose of agriculture).

Under current federal law, federal reserved water rights, like Indian reserved water rights, are immune from abandonment for nonuse. The Montana Water Use Act recognizes the distinction between federal reserved rights and state-created appropriative rights. Sections 85-2-234(6), MCA, lists the information that shall be included in a final decree for a "federal agency possessing water rights arising under the laws of the United States." Three of the eight requirements are conditional: the purpose for which the water is currently used, if at all; the place of use and a description of the land, if any, to which the right is appurtenant; and the place and means of diversion, if any. Subsections (e), (f) & (g) of 85-2-234(6), MCA. No conditional language is used in the list of required information for final decrees of state-created appropriative rights. See § 85-2-234(5), MCA.

Section 85-2-404(2), MCA, pertains to abandonment and provides:

> If an appropriator ceases to use all or part of his appropriation right or ceases using his appropriation right according to its terms and conditions for a period of 10 successive years and there was water available for his use, there shall be a prima facie presumption that the appropriator has abandoned his right in whole or for the part not used.

26

As noted above, federal law controls federal water rights. Current federal law does not permit abandonment of reserved rights for nonuse. As noted in Part II, "[s]tate courts, as much as federal courts, have a solemn obligation to follow federal law." San Carlos Apache, 463 U.S. at 571. The Water Court like any other court must follow federal law when federal law conflicts with state law. Unless and until federal law is changed, a Montana decree of abandonment of a federal reserved water right would be improper. We conclude that, to the extent necessary to fulfill the purposes of the reservation, federal reserved water rights cannot be decreed to be abandoned by reason of nonuse. We note that the Colorado Supreme Court has reached an identical conclusion with reference to federal reserved rights in that state. See United States v. City and County of Denver (Colo. 1983), 656 P.2d 1, 34-35.

The McCarran Amendment altered federal procedural law by permitting state courts to adjudicate federal reserved water rights. Neither the McCarran Amendment nor any subsequent federal case interpreting that statute has modified substantive federal law. Congress' grant of concurrent jurisdiction to the states to adjudicate federal water rights in no way diminished the nature of those substantive rights.

Based upon our analysis of the distinctions between federal reserved water rights, Indian reserved water rights, and state appropriative use rights and the manner in which the Water Use Act permits each different class of water rights to be treated differently, we hold that the Act is adequate on its face to allow the Water Court to adjudicate federal reserved rights. Because federal law controls federal reserved rights and challenges to the manner in which the Water Court adjudicates these rights turns upon the facts

27

of each adjudication, we reserve ruling on whether the Act is adequate as applied.

The Water Court is directed to proceed in accordance with this opinion, with the adjudication of water rights, including Indian and federal reserved water rights.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice Frank B. Morrison, Jr. reserves his opinion for a later time.

_____
Justice

28