**MARLYS BEAR MEDICINE, as co-personal representative of the estate of Leland Kicking Woman; Delores Iron Shirt, as co-personal representative of the estate of Leland Kicking Woman; George Kicking Woman; Molly Kicking Woman; Marlys Bear Medicine, individually and as guardian of Tan-**

ielle Kicking Woman and George Lee Kicking Woman, II; Dana Murray, as guardian of Brandi Kicking Woman, Susan Kicking Woman, Lissa Kicking Woman, and Leland Kicking Woman, Jr., Plaintiffs–Appellants,

v.

UNITED STATES of America, acting by and through the SECRETARY OF THE DEPARTMENT OF INTERIOR, Bureau of Indian Affairs, Defendant–Appellee.

No. 99–35665.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 2000

Filed March 7, 2001

1210

Monte D. Beck, Beck & Richardson, Bozeman, Montana; Joe Bottomly, Bottomly Law Offices, Kalispell, Montana, for the plaintiffs-appellants.

David W. Odgen, Acting Assistant Attorney General, Washington, D.C.; Sherry S. Matteucci, U.S. Attorney, Washington, D.C.; Mark B. Stern and Steven I. Frank, United States Department of Justice, Washington, D.C., for the defendant-appellee.

Before: ALARCON, FERGUSON, and McKEOWN, Circuit Judges.

FERGUSON, Circuit Judge:

Leland Kicking Woman, a male member of the Blackfeet Indian Tribe (the "Tribe"), was fatally injured when a tree fell on him at a logging site on the Blackfeet Indian Reservation in Montana. Kicking Woman's descendants and executors filed an action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, against the United States. In granting the Government's motion for summary judgment, the district court held that Plaintiffs failed to state a cause of action under Montana law and, even if a cause of action were stated, the discretionary function exception to the FTCA barred the suit. We hold that Plaintiffs have stated a cause of action under Montana law and that the discretionary function exception does not apply. We reverse the district court.

## BACKGROUND

Federal statutes and regulations give the Department of the Interior, acting through the Bureau of Indian Affairs (the "BIA"), responsibility for the management and preservation of the forests located on the Blackfeet Indian Reservation. 25 U.S.C. §§ 406–407; 25 C.F.R. § 163.[1] No

---

1. A detailed background of the United States' role in managing forest resources on Indian land was given by the Supreme Court in *Unit-ed States v. Mitchell,* 463 U.S. 206, 219–22, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

logging activities may take place on the reservation without the authorization of the BIA, which furnishes contracts for the transaction, approves the sale, and reserves for itself the power to supervise, warn, fine, or suspend operations not complying with contractual terms.

In 1993 the BIA authorized a contract between the Blackfeet Tribe and Bailey Peterson, d/b/a Lone Bear Logging ("Lone Bear"), for a timber operation on the Blackfeet Reservation. The contract contained a safety provision and reserved for the BIA the right to inspect and suspend Lone Bear's operation should it fail to comply with the contract.[2] A BIA forestry technician inspected the logging site regularly.

On October 6, 1993, plaintiff Leland Kicking Woman, a member of the Blackfeet Tribe, came to the Lone Bear logging site to "try out" to replace a worker who had been injured. No safety training was ever given during the "try out," which consisted of the injured employee watching Kicking Woman cut down trees.

Afterwards, Kicking Woman and the injured employee walked over to the foreman, Quinton New Robe, who was cutting down a tree. New Robe directed the two men away from him, in the opposite direction of where he intended the tree to fall. The logging operation was in an area noted for its high winds, which makes it particularly difficult to predict where a tree will fall. Neither the BIA nor Lone Bear had a formal "wind closure" policy, and although winds had already blown other trees off course on the same day, the Lone Bear crew had continued cutting. A gust of wind caught the branches of the tree felled by New Robe, sending it towards the two men. Kicking Woman saw the tree falling towards them and pushed his companion out of the way, but was himself struck by the upper branches of the tree.

Few, if any, members of the Lone Bear crew had been formally trained in basic safety procedures and none had been trained in first aid. Kicking Woman was driven to the hospital where he was diagnosed with a spinal cord injury that left him virtually immobile. He remained in the hospital for over nine months, eventually dying from complications from his injuries.

Plaintiffs, who include the personal representatives of Kicking Woman's estate, the guardians of his minor children, and his parents, filed this action in United States District Court against the United States, as represented through the BIA. They asserted a claim under the FTCA for the BIA's alleged negligence in (1) authorizing the Lone Bear contract, (2) failing to adequately inspect and manage the logging site, (3) failing to ensure that appropriate safety measures were taken, and (4) failing to ensure, under the Contract Service Act and Federal Acquisitions Act, that Lone Bear provided his employees with workers' compensation insurance.

The United States joined Lone Bear in the litigation. Lone Bear subsequently reached a settlement with Plaintiffs. Plaintiffs and the Government filed cross-motions for summary judgment. The district court granted the Government's motion and held that it did not have jurisdiction over Plaintiffs' claims because the actions of the BIA were protected under the discretionary function exception to the FTCA. It further held that neither the doctrine of inherently dangerous activity nor the United States' fiduciary relationship with the Tribe created a cause of action for Plaintiffs under Montana law. Plaintiffs filed this appeal.

---

**2.** The relevant sections of the contract read: "The Purchaser shall conduct his operations in compliance with prescribed safety practices and Federal Law," and "The Superintendent [of the BIA] may ... suspend any or all of the Purchaser's operations under the contract if the Purchaser violates any of the requirements of the contract ... After written notice from the Superintendent, continued failure to comply with any of the requirements of the contract shall be grounds for the revocation by the Approving Officer of all rights of the Purchaser under the contract...."

For reasons discussed below, this court reverses.

 We review a grant of summary judgment *de novo. Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.1999). A district court's determination that it lacks subject matter jurisdiction under the FTCA and a district court's application of the discretionary function exception are also reviewed *de novo. Foster v. United States,* 923 F.2d 765, 767 (9th Cir.1991); *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1021 (9th Cir.1989). Finally, we review *de novo* a summary judgment determination of whether an activity is inherently dangerous. *Crane v. Conoco, Inc.,* 41 F.3d 547, 549 (9th Cir.1994).

DISCUSSION

I.

The FTCA provides a limited waiver of the United States' sovereign immunity for torts committed by government employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant" under applicable law. 28 U.S.C. § 1346(b). The Act serves to enhance government accountability, eliminate the need for private bills seeking individual relief, and allocate loss across the federal taxpaying public. *United States v. Muniz,* 374 U.S. 150, 154, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Platis v. United States,* 288 F.Supp. 254, 274 (D.Utah 1968), *aff'd,* 409 F.2d 1009 (10th Cir.1969).

 The FTCA's waiver of immunity is limited by a number of exceptions. 28 U.S.C. § 2680. One of these is the discretionary function exception, which was held by the trial court to bar all claims against the Government in this case. This provision exempts from liability

> [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, wheth-

er or not the discretion involved be abused.

28 U.S.C.S. § 2680(a). The discretionary function exception is meant to avoid judicial second-guessing of governmental decisions. It is not, however, intended to create inconsistent liabilities between private and government employees performing identical acts. Thus, "in cases where the government is alleged to have committed negligence in the performance of a function such as that performed by a private citizen, rather than in the fulfillment of a broad policy-making duty, the government is subject to suit." *Faber v. United States,* 56 F.3d 1122, 1124 (9th Cir.1995). *See also United States v. S.A. Empresa de Viacao Aerea Rio (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) ("it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case"). The burden of proving the applicability of the discretionary function exception is on the United States. *Prescott v. United States,* 973 F.2d 696, 702 (9th Cir.1992).

 The test for determining whether the discretionary function exception applies was set out by the Supreme Court in *Berkovitz v. United States,* 486 U.S. 531, 536, 539, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, this Court must "consider whether the action is a matter of choice for the acting [government] employee." *Id.* at 536, 108 S.Ct. 1954. An action specifically prescribed by a "federal statute, regulation, or policy" is not within an agent's discretion and therefore not subject to the exception. *Id.* Discretion may be either affirmatively conferred or tacitly implied. *United States v. Gaubert,* 499 U.S. 315, 324–25, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). In the present case, we must ask whether applicable federal standards either explicitly or implicitly gave the BIA discretion regarding its authorization and management of the Blackfeet timber contracts.

The second prong of the *Berkovitz* test asks whether the challenged action involved a policy judgment. The exception is meant to protect "political, social, and economic judgments" that are the unique province of the Government, not all decisions involving some discretion. *Berkovitz*, 486 U.S. at 539, 108 S.Ct. 1954 (quoting *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. 2755). We have held, for example, that actions based on technical or scientific standards are not the kind of judgments meant to be protected from liability by the discretionary function exception because those actions do not involve a weighing of policy considerations. *See, e.g., United Cook Inlet Drift Ass'n. v. Trinidad Corp. (In re Glacier Bay)*, 71 F.3d 1447, 1453–54 (9th Cir. 1995) (preparing water charts involved "scientific hydrographic judgment" and was not protected by the discretionary function exception); *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1030–31 (9th Cir.1989) (failure to remove unsuitable lining materials from a canal was based on "technical, scientific, engineering considerations" and was not protected by the discretionary function exception).

Plaintiffs suggest that the discretionary function exception does not apply because the BIA's retained authority under the Lone Bear contract took the BIA's subsequent actions out of the discretionary realm. As we noted in our remand of *Dischner v. United States*, 866 F.2d 293 (9th Cir.1989), the fact that the Government retained rights under the contract does not tell us whether a policy judgment was involved. Therefore, a fact-specific application of the test articulated in *Berkovitz* is required. We apply this test to each of Plaintiffs' claims in turn. *See Glacier Bay*, 71 F.3d at 1451.

### A.

Plaintiffs first contend that the BIA negligently entrusted the timber cutting operations to Lone Bear. Federal statute allows the Government to use discretion in authorizing timber sales on Indi-

an lands held under trust. 25 U.S.C. § 406(a). While the mandatory consideration of certain enumerated factors limits this discretion somewhat, see, e.g., 25 U.S.C. § 406; 25 U.S.C. § 324 (limiting the BIA's ability to grant right-of-ways across Indian lands without the owner or tribe's permission); 25 C.F.R. § 163.11(c) (requiring the prescription of "sound economic and silvicultural and other forest management principles" before contract authorization), no instruction is given as to weighing these factors. The ultimate choice is left to the BIA. The authorization was an exercise of the BIA's mandated discretion and thus meets the first prong of the *Berkovitz* analysis.

The second prong looks to whether the action was a policy judgment that Congress intended to shield from liability. The decision to entrust the timbering operation to Lone Bear involved environmental concerns, tribal restrictions on who could work on the reservation, and the BIA's assessment of Lone Bear's previous work. This weighing of practical and policy considerations represents the kind of policy judgment that Congress intended to protect through the discretionary function exception to the FTCA. *Cf. Webster v. United States*, 823 F.Supp. 1544, 1552 (D.Mont.1992) (holding that the BIA's decision to approve the lease of reservation land for use as a speedway was protected by the discretionary function exception).

The BIA's decision to authorize the Lone Bear contract was therefore protected from civil liability by the discretionary function exception.

### B.

Plaintiffs next contend that the BIA was negligent in supervising and managing the safety aspects of Lone Bear's logging operation and ensuring that Lone Bear utilized appropriate safety precautions. As these claims are both rooted in the same operative facts, we consider them together.

The Lone Bear contract required Lone Bear to comply with "prescribed safety practices and Federal Law."[3] It also retained for the BIA the power to suspend the contract should Lone Bear fail to comply with any of its provisions. Pursuant to its own operational manual, the BIA regularly inspected the logging site to ensure "adherence to basic policy and forestry practices." 53 BIAM Supp. 3, 5.2(D) (1985). Under these circumstances, the district court found that safety monitoring is a discretionary function. Our precedents require the opposite conclusion.

We have held that "[a] general statutory duty to promote safety ... would not be sufficient" to meet the *Berkovitz* requirement for specific regulations setting out a clear duty. *Kennewick*, 880 F.2d at 1026. However, we have also held that "a failure to effectuate policy choices already made" will not be protected under the discretionary function exception. *Camozzi v. Roland/Miller and Hope Consulting Group*, 866 F.2d 287, 290 (9th Cir.1989). Even if the BIA did have discretion in its monitoring of the Lone Bear operation, its actions in carrying out its responsibilities were not protected policy judgments and therefore fail to satisfy the second prong of the discretionary function analysis.

While each case requires individual analysis, see *Dischner*, 866 F.2d at 294, we have generally held that once the Government has undertaken responsibility for the safety of a project, the execution of that responsibility is not subject to the discretionary function exception. The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not. For example, in *Kennewick*, where a break in an irrigation canal was at issue, we held

that the canal's design was protected from liability but that the actual construction was based not on policy, but rather on technical considerations, and therefore not subject to the discretionary function exception. 880 F.2d 1018, 1029 (9th Cir.1989). In *Camozzi*, where the U.S. Postal Service ("USPS") retained safety oversight of a construction project, the failure of the USPS or its representative to require floor coverings was held to be a "failure to effectuate policy choices already made," not the result of a policy decision and therefore subject to FTCA liability. 866 F.2d at 290. In *McCall v. United States Dep't of Energy*, 914 F.2d 191, 196 (9th Cir.1990), we held that the United States' maintenance of a safe workplace in the construction of an electric transmission line was exempt from discretionary function analysis because the implementation of basic safety measures was not a policy-based decision.

The Government cannot claim that both the decision to take safety measures and the negligent implementation of those measures are protected policy decisions. This argument would essentially allow the Government to "administratively immunize itself from tort liability under applicable state law as a matter of 'policy.'" *McGarry v. United States*, 549 F.2d 587, 591 (9th Cir.1976). In *Routh v. United States*, 941 F.2d 853 (9th Cir.1991), where we held that allowing a contractor to operate a backhoe without a safety device was not a policy decision protected by the discretionary function test, we stated:

> [I]n this case the [United States] contracting officer's decision whether or not a given situation created a safety hazard in violation of the safety provisions of the contract was not a public policy deci-

---

3. Both parties acknowledged that the Occupational Safety and Health Act ("OSHA") applied to Lone Bear's operations, and this Act sets out a detailed set of statutory and regulatory requirements for proper timbering practices. 29 U.S.C. §§ 651–678; 29 C.F.R. § 1910.266. While the Government correctly notes that the United States is not required to comply with OSHA as an employer, 29 C.F.R.

§ 1910.2(c), Lone Bear signed a contract promising to comply with all applicable federal laws, and the BIA retained the authority to ensure this compliance. In *Camozzi*, we held that where a contract incorporates OSHA standards, the Government's alleged failure to perform the retained safety functions was not the result of a policy choice. 866 F.2d at 288–90.

sion. The government's argument that the contracting officer must weigh the effects of shutting the job down versus the benefits of the safety measure is not convincing. The government's position, carried to its logical extreme, would allow the undercutting of a policy decision to require a safe workplace by purely economic considerations not supported in the record.

*Id.* at 856. *See also Seyler v. United States,* 832 F.2d 120, 123 (9th Cir.1987) (failure to place speed limit sign on reservation road not a policy judgment and thus not covered by discretionary function exception); *Faber v. United States,* 56 F.3d 1122, 1127–28 (9th Cir.1995) (applying same analysis to failure to post warning sign by waterfalls); *Summers v. United States,* 905 F.2d 1212, 1215 (9th Cir.1990) (applying same analysis to failure to post warning signs after allowing for beach fire pits).

The Government argues that the BIA's failure to assume responsibility for the safety practices is a result of two possible balancing judgments and is thus a protected policy decision under the second prong of the *Berkovitz* test. First, it argues that the BIA's delegation of safety measures to (and, presumably, its failure to adequately supervise) Lone Bear was a result of the BIA's policy of promoting independence in the Indian Tribes. Policies regarding tribal autonomy are most properly considered in the decision to authorize the Lone Bear contract, however, not in the decision to insist that appropriate safety precautions be taken.[4] Failure to supervise or train for safety does not promote independence.

Second, the Government argues that the BIA's failure to ensure adequate safety measures were taken was due to limited resources. This argument is not evident in the record; indeed, after the accident the BIA did implement safety training and inspection programs. The Government

apparently believes that it can overcome this objection by citing language from one of our earlier cases stating that a challenged "decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." *Miller v. United States,* 163 F.3d 591, 593 (9th Cir.1998).

The Government misconstrues *Miller* in two fundamental ways. First, our inquiry into the nature of a decision is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield. We have held that the Government has the burden of proving the discretionary function exception applies, see *Prescott,* 973 F.2d at 702, and this is not done by mere subjective statements. There must be reasonable support in the record for a court to find, without imposing its own conjecture, that a decision was policy-based or susceptible to policy analysis. The passage from *Miller* is a paraphrase of a section of the Supreme Court's opinion in *United States v. Gaubert,* 499 U.S. 315, 324–35, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), addressing cases where "established governmental policy [ ... ] allows a Government agent to exercise discretion." There was no such established policy here. Moreover, the quoted language was used illustratively to draw a distinction between protected discretionary activities (*e.g.,* selecting the method of supervising savings and loan associations) and unprotected discretionary activities (*e.g.,* driving a car), not to widen the scope of the discretionary rule. It therefore should not be used to allow the Government to create after-the-fact justifications for the purpose of liability protection.

Second, none of our cases have suggested that this language from *Miller* is intended to change our long-held doctrine that safety measures, once undertaken,

---

4. Federal statutes and regulations require the BIA to take into account tribal autonomy before authorizing a timbering contract. *See, e.g.,* 25 U.S.C. § 324, 25 C.F.R. § 163.14. Here, for example, the contract required that

the logging employees be members of the Tribe. Pursuant to its monitoring responsibilities, the BIA had shut down operations in the past for failing to comply with this contract provision.

cannot be shortchanged in the name of policy. Indeed, the crux of our holdings on this issue is that a failure to adhere to accepted professional standards is not "susceptible to a policy analysis." *See, e.g., Fang v. United States,* 140 F.3d 1238, 1243 (1998); *Camozzi,* 866 F.2d at 289–90; *Seyler,* 832 F.2d at 123. *Miller* itself addressed the issue of allocation of limited resources during a multiple fire situation, a categorically different activity that necessarily involved policy-based decisions, and not the duty to maintain safety measures once undertaken. *See* 163 F.3d at 595–96. Indeed, a number of cases relied upon by the Government concerned the distribution of limited resources, a function that we have long held to be protected under the discretionary function exception. *See, e.g., Childers v. United States,* 40 F.3d 973, 976 n. 5 (9th Cir.1994) (failure to post warnings on some winter trails in national park); *Valdez v. United States,* 56 F.3d 1177, 1180 (9th Cir.1995) (failure to post warning sign where there was not actually a trail); *Blackburn v. United States,* 100 F.3d 1426 (9th Cir.1996) (discretionary function exception applied to park's decision not to take additional safety precautions other than maintaining bridge and posting six warning signs around it).

The BIA was required to ensure that Lone Bear complied with the contract provisions, which included OSHA and internal regulations. It was also required to routinely inspect Lone Bear's operations. It is the only organization on the reservation with the appropriate safety expertise and it has virtually complete control of the timbering operations on Indian lands. Its failure to require safety measures or training was not a policy judgment that Congress intended to protect from FTCA liability.

## C.

Plaintiffs' final claim is that the BIA failed to ensure that Lone Bear had ade-

quate workers' compensation insurance in violation of the Federal Acquisition Regulations ("FAR"), 48 C.F.R. §§ 28.301(a)(1), 28.307.[5] An "acquisition" is defined by the FAR as "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease." 48 C.F.R. § 2.101.

If the FAR applies, it is a mandatory directive that is not subject to the discretionary function exception. Plaintiffs argue that because the timber sale contract included requirements that Lone Bear lope and pile the slash from the cutting unit and take other silvicultural measures, it was also a service contract and therefore subject to the FAR. The district court held, however, that the services provided by Lone Bear were too incidental to the contract, making the FAR inapplicable.

■■■ We agree with the district court, but for a different reason. Rather than engage in line-drawing issues over how much service is enough to qualify for coverage under the FAR, we hold instead that the Lone Bear contract was not a contract to which the FAR applied because the United States neither purchased nor leased any services received and these services were not "by and for the use of the Federal Government." 48 C.F.R. § 2.101. The BIA acted as a representative of the seller in the contract, not the purchaser, and any received service benefitted the Blackfeet Tribe rather than the United States, which serves as a trustee of Indian lands. The FAR therefore does not apply to the Lone Bear contract.

## II.

Because we hold that the discretionary function exception does not shield the government from liability, we must decide whether a basis for liability exists under Montana law. The FTCA imposes liability "where the United States, if a private person, would be liable to the claimant in

---

**5.** Plaintiffs do not appeal the district court's finding that the Service Contract Act does not apply.

accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 2672. Thus, Montana law applies. Plaintiffs base their claims on the doctrine of inherently dangerous activities and the United States' breach of fiduciary duty.

## A.

Following the Montana's Supreme Court decision in *Beckman v. Butte–Silver Bow County*, 299 Mont. 389, 1 P.3d 348 (2000), which came down during the pendency of this appeal, the government conceded that the inherently dangerous activities doctrine may provide the basis for Plaintiffs' claims. In *Beckman*, the Montana Supreme Court reaffirmed an earlier line of cases holding that "an employer is vicariously liable for injuries to others caused by a subcontractor's failure to take precautions to reduce the unreasonable risks associated with engaging in an inherently dangerous activity." *Id.* at 353. The critical inquiry under Montana law is not whether Lone Bear or the BIA could have taken steps to make the logging process safer, but whether they failed to do so. *See also McCall*, 914 F.2d at 194–95.

In defining whether an activity is inherently dangerous, the Montana Supreme Court in *Beckman* asked whether "[t]he proper use of [safety] precautions requires special knowledge and, when not followed or properly applied, may result in instantaneous death to the workers." *Beckman*, 1 P.3d at 354. This was certainly the case here. The record is clear that the Lone Bear employees did not know basic safety standards as set out in OSHA or other logging safety literature. There are elements to tree felling that do require special knowledge; for example, the need to be two rather than one tree length away from a falling tree.

 In sum, Lone Bear's use of untrained employees in a logging operation in a high wind area was an inherently dangerous activity that, under Montana law, imposed a non-delegable duty on the

BIA to ensure that Lone Bear took adequate safety measures on the site.

## B.

 Plaintiffs' second theory under Montana law is that the Government breached its fiduciary duty to Kicking Woman. Federal statutes and regulations "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians" and "thereby establish a fiduciary relationship." *Mitchell*, 463 U.S. at 224, 103 S.Ct. 2961. In describing the contours of this relationship, the Supreme Court wrote:

> The timber management statutes and the regulations promulgated thereunder establish the "comprehensive" responsibilities of the Federal Government in managing the harvesting of Indian timber. The Department of the Interior—through the Bureau of Indian Affairs—"exercises literally daily supervision over the harvesting and management of tribal timber." Virtually every stage of the process is under federal control.

*Id.* at 222, 103 S.Ct. 2961 (citations omitted). The Government argues that because this fiduciary duty is based in federal law and policy, it cannot support a state law claim. This argument ignores both Montana law and the nature of the fiduciary relationship.

 The district court dismissed Plaintiffs' fiduciary claim by stating that "[t]he duty which arises from the trust relationship extant between an Indian tribe and the United States is unique with no analogous duty under Montana law." In fact, Montana law creates liability for the violation of a fiduciary duty regardless of the source of that duty. *See, e.g., Local Union No. 400 of the Int'l Union of Operating Eng'rs v. Bosh*, 220 Mont. 304, 715 P.2d 36, 41 (1986) (enforcing under state law fiduciary duties created by federal law).

 Moreover, Montana allows tort claims based on a breach of fiduciary duty.[6] *See Davis v. Church of Jesus*

---

6. We note that Montana law also holds a

trustee liable for the act or omission of an

*Christ of Latter Day Saints,* 258 Mont. 286, 852 P.2d 640, 646 (1993); *Deist v. Wachholz,* 208 Mont. 207, 678 P.2d 188, 192 (1984). *See also* Mont.Code Ann. § 72–36–103 ("A trustee is personally liable for torts committed in the course of administration of the trust ... if the trustee is personally at fault.").[7] While the Government correctly notes that a legal duty cannot be imposed in tort unless a special relationship exists, a fiduciary relationship imposes just such a duty. *See Kondelik v. First Fidelity Bank,* 259 Mont. 446, 857 P.2d 687, 693 (1993) ("The existence of a fiduciary duty depends upon satisfactory proof of a special relationship. This relationship is known as a fiduciary relationship.") (citation omitted).[8]

Montana courts have recognized the fiduciary relationship between the United States and Indian tribes, holding in cases dating back as far as 1922 that the United States has a fiduciary duty to the Indians. *Mid–Northern Oil Co. v. Walker,* 65 Mont. 414, 211 P. 353, 355 (1922) ("the fiduciary relationship existing between the United States and the particular Indian wards imposed upon the Government a positive duty to lease the Indian lands and to secure for the Indians the most advantageous terms available...."). More recently, the Montana Supreme Court held that "statutes passed for the benefit of the Indians are to be liberally construed and all doubts are to be resolved in their favor." *State ex rel. Greely v. Confederated Salish & Kootenai Tribes,* 219 Mont. 76,

712 P.2d 754, 763 (1985) (quoting *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976)). In short, Montana courts hold that the United States' fiduciary relationship to the Indians creates a greater level of responsibility for its acts or omissions resulting in harm to Indians, rather than a lesser level of responsibility as the Government argues.

Contrary to the Government's claims, these cases hold, as did the Supreme Court in *Mitchell,* that the beneficiaries of this trust relationship are individual Indians as well as the tribes. *See Mid–Northern Oil Co.,* 211 P. at 355; *Confederated Salish,* 712 P.2d at 762–63; *Mitchell,* 463 U.S. at 226, 103 S.Ct. 2961 ("This Court [ ... has] consistently recognized that the existence of a trust relationship between the United States and *an Indian or Indian tribe* includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust.") (emphasis added). The BIA's duty thus ran to both the Blackfeet Tribe and to Kicking Woman.

"[W]hen a fiduciary duty exists, the party in the stronger position owes an obligation by virtue of the trust relationship to act in the best interests of the beneficiary." *Davis,* 852 P.2d at 646. *See also Kondelik,* 857 P.2d at 693; *Deist,* 678 P.2d at 193. The BIA, with its "pervasive" and "comprehensive" control over the Blackfeet timbering operations, *Mitchell,* 463

---

agent where the trustee, *inter alia,* (a) had the power to direct the agent, (b) failed to properly supervise the agent where the trustee has this power, or (c) neglected to take "reasonable steps to compel the agent to redress the wrong in a case where the trustee knows of the agent's acts or omissions." Mont.Code Ann. § 72–34–502(2). Here, the BIA, despite both the power to direct and supervise Lone Bear's operations and knowledge that proper safety precautions were not being taken, failed to take any actions to protect Kicking Woman, a beneficiary of the trust.

7. According to this statute's Official Comments, "[a] trustee is 'personally at fault' when the trustee commits a tort either intentionally or negligently." Mont.Code Ann. § 72–36–103.

8. Other Montana cases find that the special relationship creating a legal duty may arise out of a custodial relationship, *Lopez v. Great Falls Pre–Release Services, Inc.,* 295 Mont. 416, 986 P.2d 1081, 1085 (1999), a contractual relationship, *Mills v. Mather,* 270 Mont. 188, 890 P.2d 1277, 1284 (1995), or an "advisor/advisee" relationship, *Simmons Oil Corp. v. Holly Corp.,* 258 Mont. 79, 852 P.2d 523, 526 (1993). The applicable federal statutes, regulations, policy, and the Lone Bear contract here could well create such a relationship even in the absence of a fiduciary relationship.

U.S. at 219, 222,, 103 S.Ct. 2961 had a duty to ensure that basic safety practices were communicated and used at the logging site.

The district court judgment is RE-VERSED and the case is REMANDED for proceedings consistent with this opinion.